**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| DARIN E. KANDT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 11-2701-JAR |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**CORRECTED MEMORANDUM ORDER AND OPINION**

This matter is before the Court seeking review of the final decision of the Defendant Commissioner of Social Security denying Plaintiff Darin E. Kandt's application for disability insurance benefits[1] and supplemental security income (SSI) benefits under the Social Security Act.[2] Upon review, the Court finds that the underlying decision is not supported by substantial evidence in the record, and thus reverses and remands the decision of the Commissioner.[3]

**I.      Procedural History**

In December 2008, Plaintiff filed an application for a period of disability and disability insurance benefits. His application was denied initially and upon reconsideration. Plaintiff timely requested a hearing before an administrative law judge (ALJ). After a hearing, the ALJ

---

[1]42 U.S.C. §§ 410 *et seq.*

[2]42 U.S.C. §§ 1381 *et seq.*

[3]In its original Memorandum and Order, the Court mistakenly stated the standard of review as *de novo*; the Order is corrected to reflect the correct standard of review, whether the decision is supported by substantial evidence in the record, as set forth in the Court's analysis.

issued a decision in October 2010 finding that Plaintiff was not disabled; in October 2011, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. Plaintiff then timely sought judicial review before this Court.

## II.     Standard for Judicial Review

Judicial review under 42 U.S.C. § 1383(c)(3) is limited to whether the defendant's decision is supported by substantial evidence in the record as a whole and whether defendant applied the correct legal standards.[4] The Tenth Circuit has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[5] In the course of its review, the court may not re-weigh the evidence or substitute its judgment for that of defendant.[6]

## III.    Legal Standards and Analytical Framework

Under the Social Security Act, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . "[7] An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ."[8] The

---

[4] *See White v. Massanari*, 271 F.3d 1256, 1257 (10th Cir. 2001) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994)).

[5] *Id*. (quoting *Castellano*, 26 F.3d at 1028).

[6] *Id.*

[7] 42 U.S.C. § 423(d)(1)(A); § 416(i); § 1382c(a)(3)(A).

[8] *Id.* § 423(d)(2)(A); § 1382c(a)(3)(B).

2

Secretary has established a five-step sequential evaluation process to determine whether a claimant is disabled.[9] If the ALJ determines the claimant is disabled or not disabled at any step along the way, the evaluation ends.[10]

## IV. Discussion

Plaintiff does not challenge the ALJ's determination at step one that Plaintiff has not engaged in substantial gainful activity since the amended alleged onset date of January 4, 2006 through the date of last insured of December 31, 2006. Nor does Plaintiff challenge the ALJ's determination at step two that Plaintiff has medically "severe" impairments of: generalized anxiety disorder, major depressive disorder, and obsessive-compulsive disorder. Plaintiff does not challenge the ALJ's determination at step three that Plaintiff's impairments or combination of impairments do not meet or medically equal listings 12.04 (Affective Disorders), or 12.06 (Anxiety Related Disorders).[11]

Plaintiff does expressly challenge the ALJ's determination at step four, that Plaintiff has the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with only the nonexertional limitation that he is limited to simple work of SVP 3 or less. Plaintiff also challenges the ALJ's determination at step five that although Plaintiff is unable to perform any past relevant work, considering Plaintiff's age, education, work experience and residual functional capacity, there are jobs that existed in significant numbers in the national economy that Plaintiff can perform.

---

[9] 20 C.F.R. § 416.920(a); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1983).

[10] *Id.*

[11] 20 C.F.R. Pt. 404, subpt. P., app. 1, Listing of Impairments

Plaintiff contends that the ALJ's determinations were the product of four errors: (1) in determining Plaintiff's residual functional capacity (RFC), the ALJ failed to consider or discuss that Plaintiff had Global Assessment Functioning (GAF) scores of 50 or less on dozens of occasions over several years; (2) in violation of SSR 96-8P, the ALJ disregarded and gave no weight to the statements of Plaintiff's brother and Plaintiff's father, who is a medical doctor; (3) the ALJ failed to follow SSR 85-15 in assessing the effect Plaintiff's mental impairments have on his ability to perform work-related activities; and, thus, (4) the ALJ failed to pose an accurate hypothetical question to the vocational expert that included all of Plaintiff's limiting mental impairments. Because the third and fourth points of error are subsumed in the first point of error, which focuses on the ALJ's consideration of evidence provided by Dr. Collison, the Court will only address the first and second points of error raised by Plaintiff.

This appeal essentially turns on whether the ALJ improperly disregarded the opinion and treatment notes, including the GAF assessments of Plaintiff's treating physician, Dr. Collison, and in so doing, failed to properly assess the effect Plaintiff's mental impairments, including his obsessive-compulsive disorder, have on his ability to perform work-related activities.

### A.   Failure to Consider GAF Scores

The ALJ expressly gave ". . . no weight to the opinion of the claimant's current treating psychiatrist, Joan Collison, M.D," because "Dr. Collison did not begin treating the claimant until after the date last insured and could therefore not opine as to the claimant's mental condition prior to the date last insured based solely upon the claimant's living arrangements with his parents." To be sure, the ALJ properly disregarded Dr. Collison's opinion on the ultimate question of whether Plaintiff was able to work. Yet, the ALJ also evidently gave no weight to

Dr. Collison's assessment of Plaintiff's GAF, nor other opinions, diagnoses and treatment notes rendered by Dr. Collison.

Plaintiff complains that the ALJ failed to consider the GAF scores assessed by Dr. Collison during the period she treated him, between May 2007 and January 2010. These GAF scores ranged from a low of 50 on February 23, 2009, to highs of 60-65 in November 2007 and January 2008. But typically, Dr. Collison scored Plaintiff's GAF at 55 or between 55-60 during the thirty month period that she treated him. While GAF scores are not determinative of mental disability, they are relevant evidence that should be considered along with all other medical evidence.[12] While the ALJ did not mention the GAF scores in particular, it is evident from his opinion that he did review Dr. Collison's records. The question then, is did he properly ignore the GAF scores and other treatment records, for the reason stated, that Dr. Collison began treating Plaintiff after the date last insured? The Court thinks not.

While it is incumbent on the claimant to show disability during the relevant period, that is, between the alleged onset date and before the expiration of insured status, medical evidence after the date of last insured status may well be relevant. As the Tenth Circuit held in *Baca v. Department of Health & Human Services*,[13]

> Evidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date or may identify additional impairments which could reasonably be presumed to have been present and to have imposed limitations as

---

[12] *Petree v. Astrue*, 260 F. App'x 33, 42 (10th Cir.2007).

[13] 5 F.3d 476 (10th Cir.1993).

of the earning requirement date.[14]

The key is that the subsequent evidence must bear upon the severity of the claimant's impairments during the period between onset date and last insured status date. This nexus is established by evidence from which it could reasonably be presumed that the limitations existed as of the earning requirement date.

On the other hand, when there is no other evidence in the record suggesting that claimant experienced disabling impairment during the insured period, subsequent evidence, including a physician's retrospective diagnosis, is insufficient.[15] Thus, in *Flint v. Sullivan*,[16] the Tenth Circuit held there was not substantial evidence of disability, when the evidence consisted only of a treating physician's retrospective diagnosis ten years after the insured period, and the claimant's subjective testimony about his symptoms during the insured period. But, in *Baca*, the Tenth Circuit held that evidence concerning medical treatment fourteen months after the expiration of insured status was relevant and material, when coupled with other medical evidence of such medical treatment during the period of insured status.[17]

Here, Dr. Collison's treatment notes, diagnosis and certain opinions are relevant, because the temporal proximity suggests a reasonable presumption that the impairment existed during the insured period. Dr. Collison began treating Plaintiff just five months after expiration of his insured status, and continued to treat him for approximately thirty months. And, the treatment

---

[14] *Id.* at 479.

[15] *Coleman v. Chater*, 58 F.3d 577, 579 (10th Cir.1995).

[16] 951 F.2d 264, 267 (10th Cir.1991).

[17] *Baca*, 5 F.3d at 479.

notes and opinions of Dr. Collison address the severity and continuity of Plaintiff's depression and anxiety disorder, which had been diagnosed by other doctors prior to the expiration of insured status.

More importantly, Dr. Collison also diagnosed severe OCD, and described the effects of Plaintiff's OCD on the course of treatment and on work-related limitations. Dr. Collison opined in July 2007—just seven months after the insured period—that Plaintiff's OCD had "likely been severe and debilitating for some time." Moreover, there is evidence in the record that Plaintiff had struggled not only with depression and anxiety disorder, but with OCD during the period of insured status. In fact, in 1979, Plaintiff was diagnosed at the age of six with moderate to severe Tourette's Syndrome, which manifests in compulsive physical behaviors and outcries.

Moreover, Dr. Collison opined that Plaintiff's OCD, coupled with his severe social anxiety disorder and avoidant personality disorder, explained why Plaintiff had been reluctant to consistently seek treatment in the past, why Plaintiff was late or missed appointments with her, and why Plaintiff otherwise engaged in behaviors that might be perceived as non-compliant. These behaviors, Dr. Collison opined, were consistent with someone suffering from severe OCD and the other anxiety related disorders of Plaintiff. Contrary to the ALJ's view, in no way was Dr. Collison's opinion as to the length and severity of Plaintiff's OCD based solely on the fact that he had lived with his parents since 2004.

The ALJ's disregard of this medical evidence of Plaintiff's most extensive course of treatment, from 2007 to 2008, is compounded by the ALJ's consequential disregard of Dr. Collison's periodic GAF score assessments of Plaintiff. Although GAF scores are not alone determinative of disability, and have no "direct correlation to the severity requirements of the

mental disorders listings,"[18] they are one relevant type of evidence.[19]  And Plaintiff's GAF scores, which were as low as 50, but typically fell in the range of 55 or 55-60 during Dr. Collison's treatment, evidence serious or moderate impairments, as does Dr. Mittleman's GAF assessment of 55 in November 2005.  GAF scores of 41 to 50 represent "serious" impairments, while scores of 51 to 60 represent "moderate" impairments.[20]

Furthermore, some of Dr. Collison's opinions directly relate—without reaching the ultimate question of disability—to the effects of Plaintiff's mental limitations on his ability to function in a workplace.  First she opined that Plaintiff's missing appointments and being late for appointments was a common manifestation of severe OCD.  She further opined that Plaintiff's OCD is uncontrolled and debilitating, consuming on average, two to four hours a day in repetitive behaviors; and that Plaintiff needs aggressive pharmacotherapy as well as "aggressive cognitive-behavioral based exposure-response prevention (ERP) psychotherapy." She opined that Plaintiff had a poor prognosis, and would require a year or more of intense therapy, and financial constraints made that a challenge.

Upon remand, in determining RFC, the ALJ should consider Dr. Collison's GAF assessments, along with Dr. Collison's other treatment notes, diagnoses, and opinions (except for the ultimate opinion of disability),[21] because Dr. Collison's treatment of Plaintiff has sufficient temporal and evidentiary nexus to be considered as evidence of disability during the insured

---

[18]*See* 65 Fed. Reg. 50746-01, 50764-65, 2000 WL 1173632 (August 21, 2000).

[19]*Lee v. Barnhart*, 117 F. App'x 674, 678 (10th Cir. 2004).

[20]DSM-IV-TR (2000) 4th ed., at 32-34.

[21]*Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1029 (10th Cir.1994) (Explaining that a treating physician may offer an opinion which reflects a judgment about the nature and severity of the claimant's impairments including the claimant's symptoms, diagnosis and prognosis, and any physical or mental restrictions.)

period.

### B. Giving no Weight to Statements of Plaintiff's Father and Brother

Plaintiff argues the ALJ erred in expressly giving no weight to the statement of Plaintiff's father, Dr. Ray E. Kandt, M.D., and impliedly giving no weight to the similar statement of Plaintiff's brother. Dr. Kandt stated that Plaintiff "never leaves the home or socializes and is unable to complete even minimal tasks." He further described Plaintiff as "depressed, anxious, and stuck in ritualistic obsessive-compulsive behaviors such as repetitive hand washing and keeping piles of mail unopened . . . and recurring trouble sleeping resulting in unpredictable and varying sleep patterns." Because Plaintiff lives with Dr. Kandt, these statements could obviously be based on Dr. Kandt's observations, rather than a recitation of Plaintiff's own subjective complaints. Plaintiff's brother Douglas Kandt, provided a similar affidavit. And, although Plaintiff does not expressly challenge the ALJ's determination of Plaintiff's credibility, the issue is related, as Plaintiff's father and brother largely corroborated Plaintiff's subjective complaints of an erratic schedule and daily life marked by engaging in multiple hours of repetitive behaviors that precluded him from sustained productive activity. The ALJ explained that he was not giving weight to the statement of Plaintiff's father because "his opinion may be biased due to his relationship with the claimant and it concerns an issue reserved for the Commissioner." While the ALJ properly disregarded Dr. Kandt's opinion on the ultimate issue of disability, it was improper to disregard the rest of Dr. Kandt's statements simply because he is Plaintiff's father.

Upon remand, the ALJ must explain the weight or lack thereof given to these third party statements, in accordance with SSR 85-16, which states that "relevant, reliable information,

obtained from . . . family members . . . may be valuable in assessing" whether a mental impairment is disabling.[22] To be sure, the ALJ can consider the third party's relationship with the claimant and corresponding motivation or bias; but the ALJ cannot discredit the third party's statement solely for that reason, or the statements of family members would never be given credit. And, it is family members, particularly family members who live with the claimant, as Plaintiff's father does, who are in a unique position to provide percipient evidence of behavior, activities of daily living, impairments and limitations. One of the factors the ALJ is to consider is the consistency of the third party statements with other evidence in the record.

Moreover, although Plaintiff did not directly challenge the ALJ's determination that Plaintiff is not credible, the Court would be remiss in not noting several concerns about the ALJ's credibility analysis. In determining the credibility of an individual's statements, SSR 96-7p provides that the ALJ is to "consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how the affect the individual, and any other relevant evidence . . . ."[23]

Here, the ALJ relied upon Plaintiff's pattern of being late or missing appointments, not being totally compliant with taking prescribed medications, his apparent reluctance or dilatoriness in getting psychotherapy, and his withdrawal from psychotherapy for a period of time. Certainly a claimant's failure to comply with prescribed treatment is relevant to the issue

---

[22] SSR 85-16, 1984 WL 56855 *4 (1985).

[23] 20 C.F.R. §§ 404.1513(d)(4) and 416.913(d)(4); SSR 96-7p, 1996 WL 374186 *1 (July 2, 1996).

of the credibility of his or her subjective complaints of pain or other symptoms.[24] But, when the claimant's mental impairments may be an underlying reason for what might be perceived to be non-compliance, a more careful consideration of the evidence is necessary. SSR 96-7p states that,

> the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.[25]

Where, as here, there are offered explanations, including Plaintiff's severe OCD, social anxiety disorder, avoidance disorder, and financial constraints, credibility should not be rejected without more consideration.

### V.    Conclusion

For the above stated reasons, the decision of the Commissioner is reversed and remanded, for proper consideration of all of the evidence, including the medical evidence of Dr. Collison, as well as a third party statements, and a reassessment of Plaintiff's RFC.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the Commissioner's decision denying Plaintiff disability benefits and supplemental security income is **REVERSED and REMANDED** to the agency for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**Dated: February 19, 2013**

                                        S/ Julie A. Robinson

---

[24] SSR 96-7p, 1996 WL 374186 *7 (July 2, 1996).

[25] *Id.*

        **JULIE A. ROBINSON**

        **UNITED STATES DISTRICT JUDGE**